Syllabus.

## 𝔅𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

### RUSSELL CREEK COAL COMPANY v. WELLS.

#### NOVEMBER 17, 1898.

Absent, Riely, J.

1. PLEADING—*Demurrer—Bill of Exceptions.*—It is unnecessary to except to the opinion of a trial court overruling a demurrer to a declaration.

2. DEMURRER—*Considering the Evidence.*—This court cannot look to the evidence in determining whether or not the ruling of the trial court upon a demurrer to a declaration was erroneous.

3. INSTRUCTIONS—*Misleading—Correction by other Instructions.*—Although an instruction, standing alone may have been misleading, the verdict of the jury will not on that account be set aside where it appears that the objection thereto was corrected by other instructions given by the court.

4. MASTER AND SERVANT—" *Mine-Boss* "—*Fellow-Servant—Vice-Principal.*—A " mine-boss " is not a fellow-servant of members of his gang under all circumstances. Though he is such fellow-servant while discharging duties affecting the mere administration of the work to be done, he is not a fellow-servant when discharging the non-assignable duties of the master.

5. MASTER AND SERVANT—*Safe Place to Work—Non-Assignable Duty—" Mine-Boss."*—It is the duty of the master to furnish a reasonably safe place in which the servant is to work, and this duty is not assignable. But if the place was reasonably safe in the first instance, and was rendered unsafe afterwards by the negligent manner in which the " mine-boss " directed the work to be done, or the needed precautions to be taken, whereby the servant was injured, the master is not liable. Nor is the master liable for injuries resulting from risks assumed by the servant, or from failure to keep in a reasonably safe condition the place in which he is to work, when the condition of the place was constantly changing, and the duty of keeping it in safe condition devolved both upon the servant and his " mine-boss."

6. MASTER AND SERVANT—*Safety of Servant—Negligence.*—The servant is

under as great obligation to provide for his own safety from such dangers as are known to him or are discernible by ordinary care on his part, as the master is to provide for him, and the negligence of the master does not excuse the servant for the failure to exercise such care, if such failure was the cause of the injury complained of.

7. DEMURRER TO EVIDENCE—*How far Evidence of Demurrant Considered.*— Upon a demurrer to evidence, the evidence of the demurrant, so far as it is uncontradicted, is entitled to consideration.

8. MASTER AND SERVANT—*Safe Place—Risks Assumed by Servant.*—A servant who knows the unsafe condition of the place in which he is working is not compelled to continue the work, but if he does continue it, without exercising ordinary prudence and care for his own safety, he must be held to have assumed not only the risks ordinarily incident to the service when he entered upon it, but such as became known to him during the progress of the work, or which were readily discernible to a person of his age and capacity in the exercise of ordinary care.

Error to a judgment of the Circuit Court of Wise county rendered December 12, 1896, in an action of trespass on the case wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Reversed.*

The evidence in this cause sufficiently appears in the opinion of the court. All of the instructions objected to are quoted in the opinion except " No. 9," offered by the defendant company, which is as follows:

" The court tells the jury that the plaintiff cannot base his right of recovery in this case upon evidence coming from the defendant's witnesses which contradicts his own evidence."

The declaration in this case was in the following words and figures, to-wit:

" Circuit Court for Wise county, to-wit:

" August Rules, 1895.

" R. A. Wells, who sues '*in forma pauperis,*' plaintiff, complains of Russell Creek Coal Company, a corporation doing business under the laws of the State of Virginia, defendant, and which has been duly summoned, &c., of a plea of trespass on the case, for this, to-wit: That heretofore, and at the time of committing the grievances hereinafter mentioned, the said

defendant was owner and proprietor of a certain coal mine, in the county of Wise and State aforesaid, and which defendant was then and there working, operating, and taking coal therefrom, and being such owner, proprietor, and operator of the coal mine aforesaid, heretofore, to-wit, on the ———— day of ——————, 18—, the said R. A. Wells, at the special instance and request of the said defendant company, became and was the hired servant and workman of defendant company, and was then and there employed by defendant as its workman and servant in operating said coal mine and in mining and getting out coal from the said mine for the defendant, and for which services the plaintiff was paid certain wages by the defendant. And the plaintiff saith that while he was the hired workman and servant of the defendant, in and about the work aforesaid, it became and was the duty of the said defendant to use due, reasonable, and ordinary care for the said plaintiff while he was so employed and working in said coal mine, and also it became and was the duty of the said defendant to use reasonable skill and care for the safety of the said plaintiff while engaged in operating and working in said mine in the employment of the defendant as aforesaid.

"Yet the said defendant, not regarding its duty, did not use the proper care for the safety of the said plaintiff while so engaged in working in said coal mine, and did not operate said coal mine with reasonable safety and ordinary care, as it could and might have done, so as that plaintiff could work therein with reasonable safety in the employment of the said defendant, but wholly neglected so to do, and wrongfully and negligently permitted large stones, slate, and earth to hang loosely in and about said coal mine, and in about the roof of same, at the point where the said plaintiff was at work for the defendant, and at the point where he was assigned to work by the said defendant, and then and there wrongfully and negligently failed to provide the said coal mine and the roofing of the said coal mine with sufficient props and stays to keep the stone. slate, coal, and earth that hung loosely in and about said roofing from falling in and upon said plaintiff while engaged at such work, for and in the service of the defendant as aforesaid, and then and there negligently employed and kept [in] its service, to manage and control and operate said coal mines, incompetent and inexperienced agents, and by means whereof, and while the plaintiff was engaged in the work and service of the defendants, large and ponderous pieces of stone, slate, and earth fell from the roof of the said mine and in and upon the said plaintiff, and by such falling in of said slate, stone, and earth, so negligently permitted to hang loosely in and about said roof, the said plaintiff was caught and crushed under and between said slate, stone, and earth, and was injured in and about the body, back, hips, thighs, legs, and arms, and otherwise greatly injured and afflicted, so much that the plaintiff hath lost the use of his hips and legs and back, and for a long while, to-wit, from the day of said injury aforesaid, hath been and until

the bringing of this suit was and still is afflicted and disabled, and from which said injury the plaintiff, in manner and form aforesaid, is permanently disabled. By means whereof the plaintiff has sustained damages of $10,000. Therefore he brings his suit."

There was a demurrer to the declaration, and the objections urged on the demurrer were:

"It does not allege why or how it became the duty of the defendant to use due, reasonable, and ordinary care for the safety of plaintiff. Did the obligation arise from a specific agreement, or by operation of law?"

"It does not state with sufficient particularity just where in the mine the accident happened. The trial judge ruled, as will appear from the record, that the plaintiff could be properly said to be at the place of work when the accident happened, even though he was actually away from it, if his absence was in the line of his work.

"In the light of the proof in the case, the reason for the demurrer becomes apparent, and very reasonable."

The demurrer was overruled, and the defendant excepted.

*Fulton & McDowell* and *Hobart Miller*, for the plaintiff in error.

*Bullitt & Kelley*, *O. M. Vicars*, and *Alderson & Alderson*, for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

The defendant in error (plaintiff in the court below) received injuries by the falling of a piece of slate from the roof of the coal mine of the defendant company in which he was working, and brought this suit, in the Circuit Court of Wise county, to recover damages therefor, and upon the trial, judgment was rendered against the defendant company for $2,000.

A bill of exceptions was taken to the action of the lower court in overruling the demurrer to the plaintiff's declaration. This was unnecessary, as the judgment upon the demurrer was sufficient to bring this ruling under review by this court upon a writ of error.

The declaration states a good cause of action and the demurrer was properly overruled. *Richmond Locomotive Works* v. *Ford*, 94 Va. 640; *Jones* v. *Old Dominion Cotton Mills*, 82 Va. 140, 147–8; 4 Minor's Inst. 690; Code of Va., sec. 3246.

Whether the *allegata* and *probata* correspond is another question, but this court cannot look to the evidence in determining whether or not the ruling of the court below upon the demurrer is erroneous.

The next assignment of error is to the refusal of the court to exclude evidence tending to show an accident happening away from the place where the plaintiff was actually working, the grounds upon which the motion was made being that the defendant company had no notice that such proof would be offered. It is unnecessary, however, to consider this assignment of error, as the judgment complained of must be reversed for other errors, and the question is not likely to arise at the next trial.

The third assignment of error is to the refusal of the court to grant the defendant company a continuance after all the evidence had gone to the jury. This is without merit, but for the same reason need not be discussed.

At the trial the court gave five instructions to the jury at the instance of the plaintiff, and to the first and third the defendant company objected. They are as follows:

"No. 1. The court tells the jury that it was the duty of the defendant, except in so far as it may have been excused therefrom by the duty of the plaintiff, under the evidence, to use ordinary care and skill in the management of that kind of business for the protection of the plaintiff, and if they believe from the evidence that the defendant failed to do what, under the

evidence, the jury may believe was incumbent on its part to do, in order to keep the room in which the plaintiff worked in a reasonably safe condition in that nature of business, and that the injury to the plaintiff was caused by such failure, if there was any, then they should find for the plaintiff."

"No. 3. The court tells the jury that if they believe from the evidence, that under and by the rules of the defendant company, it was the duty of the bank or mine boss of said company to make daily visits to the room in which the miners were at work for the purpose of seeing whether or not said rooms were in safe condition for the miners to continue their work, and if they further believe from the evidence that the mine-boss of the defendant failed or neglected to visit the room in which the said plaintiff was at work, or failed, if he made such visit, to discover the danger which threatened the plaintiff if he continued his work in said room; if they believe such danger was threatening and could have been discovered by the use of ordinary diligence on the part of said boss, then said company was guilty of negligence."

The objection to the first is that it does not distinguish between the proximate and remote cause of the accident complained of, and that it was calculated to mislead the jury into finding for the plaintiff, in disregard of the evidence tending to show, at least, that the proximate cause of the injury was the "shot" or "blast" made by the plaintiff shortly preceding the accident; the contention of the defendant company being that the instruction should have been so amended as to distinguish between the proximate and remote cause by inserting the word "directly" after the word "was" in next to the last line of the instruction, whereby the concluding sentence of the instruction would have read "and that the injury to the plaintiff was *directly* caused by such failure, etc.," *i. e.*, the failure of the defendant company to keep the room in which the plaintiff worked in a reasonably safe condition in that nature of business, etc.

The instruction should have been so amended, and this will more fully appear when we come to discuss the evidence in the case.

The third instruction, standing alone, might have misled the jury, but the objection thereto, if any, was removed by the fifth and sixth instructions given for the defendant company.

Defendant's fifth instruction told the jury that if they believed from the evidence that the plaintiff himself loosened the piece of slate which fell upon him, by picking or pulling at it, and so caused the accident, or if they believed plaintiff pulled the slate down upon himself, then they should find for the defendant; and the sixth told them that, if the plaintiff could have avoided the accident by the exercise of ordinary prudence and care, then they should find for the defendant, and that in an employment which is hazardous the prudence and care exercised must measure up to the dangers of the employment.

With these instructions before the jury it is difficult to perceive how they could have been misled by the plaintiff's instruction No. 3.

The next assignment of error is to the refusal of the court to give instructions numbered three, seven, and nine, asked for by the defendant company. No. 3 is as follows:

"The court tells the jury that if they believe from the evidence that the accident was due to the negligence of the mine-boss, then the negligence was the negligence of a fellow-servant, and the plaintiff cannot recover."

This instruction proceeds upon the idea that the mine-boss was, under all circumstances, to be considered as the fellow-servant of the plaintiff, for whose negligence the defendant was not responsible. It should have discriminated between the duties imposed upon the mine-boss, which were not assignable, and with respect to which the defendant company could not relieve itself from liability, and his duties affecting the mere administration of the work with respect to which he

might properly be regarded as fellow-servant of the plaintiff.

"It is the duty of the master to furnish and maintain a reasonably safe place in which the servant is to work, and this duty is personal to the master. But if the place is reasonably safe in the first instance, and is afterwards rendered unsafe by the negligent manner in which the boss or foreman of a gang of hands directs the work to be done, in doing which an injury is inflicted, the master is not liable for such injury." *Richmond Locomotive Works* v. *Ford, supra.*

While it was the duty of the defendant company to provide a reasonably safe place in which the plaintiff was to work, and this duty it could not assign to another, yet if it was in the first instance in a reasonably safe condition. and afterwards was rendered unsafe by the negligent manner in which its "mine-boss" directed the work to be done, or the needed precautions taken, whereby the plaintiff was injured, the "mine-boss" would be properly held a fellow-servant of the plaintiff, or the risk be deemed to be one of those assumed by the plaintiff when he entered the employment, or when apprised of the danger and continued his work, especially if the evidence showed that, from the nature of the work, the condition of the place was constantly changing, and the duty of keeping it in a safe condition in the prosecution of the work, devolved both upon the plaintiff and the "mine-boss." This instruction was calculated to mislead or confuse the jury, and therefore was properly refused.

The seventh instruction asked for by the defendant company, and refused, told the jury "that the plaintiff in this case was bound to exercise as much care in his own behalf as the defendant was required to exercise in his behalf, and negligence on the part of the defendant did not excuse the plaintiff from a failure to exercise such care, if such failure was the cause of the accident."

"It is the duty of the servant to exercise care to avoid injuries to himself. He is under as great obligation to provide for

his own safety from such dangers as are known to him, or are discernible by ordinary care on his part, as the master is to provide for him. He must take ordinary care to learn the dangers which are likely to beset him in the service. He must not go blindly to his work where there is danger. He must inform himself. This is the law everywhere."

In other words, he (the servant) is under as great obligation to provide for his own safety from such dangers as are known to him, or are discernible by ordinary care on his part, as the master is to provide for him. Bailey's Liability of Master, p. 159; *Wormwell* v. *Maine Central R. Co.*, 79 Me. 397; *McDonald* v. *Norfolk & W. R. Co.*, 95 Va. 105; *Bertha Zinc Co.* v. *Martin*, 93 Va. 791; and *Robinson* v. *Dininny, ante,* p. 41.

Instruction No. 7 correctly expounded the law applicable to this case, and should have been given.

Instruction No. 9 asked for by the defendant company was properly refused.

This brings us to the consideration of the remaining question, whether or not the evidence in the case sustains the verdict of the jury.

The plaintiff testified as follows: " I have been engaged in mining about seven years. At the time the accident happened, which was in November, 1894, * * * I had been working as a miner for the Russell Creek Coal Co. only a few days; I was working in a room at the time I was hurt. I had an empty car on the track. I put a shot (blast) and then went outside in the main entry while it went off, and then went back into the room in about twenty minutes. When I went back, I started to put up my pick to see if the roof was safe, but before I got the pick up, and before I touched the roof, the slate fell on me. It is always the custom to examine the roof after a shot. It was the miner's duty to prop the room where he was working on the gob side, but not on the track side, except within seven feet of the face of the coal. It is the company's duty to take care of the roof over the track, except

within seven feet of the face of the coal. I understood it was the company's duty to look after the roof of the room on the track side, or over the gangway back of the seven-foot line. My butty, or partner, William Collins, told me before the accident happened that it was the company's duty to take care of the roof over the trackway." Here follows a description of his injuries, and the witness then says: "The accident could only have been prevented by putting in a collar or cross-timber, to hold up the slate which fell, and I understood it was the company's business to put in these collars or cross-timbers. A collar or cross-timber is timber put across from the rib of the room to the pillar on the gob side. A prop would not have prevented the slate from falling. The slate first broke loose from the rib side. The point where I was injured was about twelve feet from the face of the coal, and about fifty feet from the entrance to the room from the main track. I fell on the trackway, or gangway. The slate that fell on me was right over the trackway. The mine-boss did not come into the room the morning the accident happened. I made no contract whatever with the company releasing it from taking care of the room."

Upon cross-examination, the witness, after stating his experience as a miner, says: "I have never seen any collars or cross-timbers set in the Russell Creek Mine over the gangway or track in a room. As a rule they are not necessary. It was only occasionally they had to be set. If there was loose slate over the trackway it was necessary to either pull the slate down or to set cross-timbers or collars. If there was loose slate, and the miner knew it, he would take it down if he could. The day before the accident happened Collins, my butty (partner), had been pulling with his pick at a piece of slate, which was in the roof about at the point where I was struck. I cannot say whether it was the same piece that fell upon me or not, but it was about the same place. Collins tried to get this piece down, but could not do it, and he told me that it was safe. I

so understood him. I considered it safe. Collins was not in the room at the time the accident happened. The shot I fired might have loosened the slate which fell. I do not know whether it was loose before that or not. It might perhaps have been the shot that loosened it. After a shot is fired, it is the miner's duty to examine the room for loose slate, and if a piece of slate falls while he is examining the roof, I suppose it is pure accident. The miner cannot prevent it. * * * * When slate or other obstructions fall on the track, the mine-boss has it moved by others, or employs the miner to move it, and pays him extra for it. * * * When the miner wanted props, he went outside and sawed them the right length, and the company would have them sent in."

This is all the evidence as to how the accident happened. A witness for plaintiff, who was working in an adjoining room when the accident happened to plaintiff, after describing the slate that fell, says: "I cannot just say whether it was the duty of the company to look after the roof over the track or gangway in the room or not. I worked mostly in the entry when I worked there, and whenever I put in a collar, they paid me extra for it. * * * I was never called on to put a collar across the trackway in a room, and never knew of any other miner to be; no collar was ever set in my room."

Other witnesses for the plaintiff say that no collars were ever put up in the rooms in which they worked for the defendant company, while one says that it was the duty of the miner to do his own propping in the room, except over the trackway; that the company paid the miner to move slate that fell upon the trackway, and that the witness had put collars across the trackway, for which the company paid him extra, and that his understanding was that the miner and "mine-boss" both were to watch the roof all over the room; and if the miner found anything wrong he would make it safe if it was on the gob side, if it was on the track side he would call the mine boss' attention to it, and the mine boss would direct some one to fix it.

Snyder, the defendant company's mine boss at the time the plaintiff was injured, examined as a witness for the defence, says: "All collars and timbers which have been set in rooms in the mine of Russell Creek Coal Company have been set by the miners themselves. They are paid five cents more per car for doing their own propping and timbering. I went into Wells' (plaintiff) room the day the accident happened, and before it occurred. He pointed out to me a piece of slate, which afterward fell, and told me it was loose. I told him to set a prop on the gob side with a cap on it, and he said he would. I then went out. He never did set any prop or timber."

This statement of Snyder is wholly uncontradicted, except as to his being in plaintiff's room the morning of the accident, although the plaintiff was recalled as a witness in his own behalf. He only attempts to excuse himself from a failure to do what Snyder states he told him to do, and what he promised to do, by testifying that in his and the opinion of other witnesses, introduced in rebuttal, if he had done what the mine-boss had directed him to do, it would not have prevented the accident. This did not meet the issue, and subjecting the evidence to the rule governing where a case is before us as upon a demurrer to evidence, the testimony of Snyder, in so far as it is uncontradicted, is entitled to consideration, and it therefore appears that the verdict of the jury is not sustained by the evidence. It is thereby shown that if the room in which plaintiff was at work was, before he sent off the shot just preceding the accident, in an unsafe condition, he knew it, and promised to set a prop under the piece of slate which he said was loose, but did not do it, and the evidence of the plaintiff, as well as that of Snyder, shows that it was the duty of plaintiff to watch the roof all over the room, including the trackway where stood the car he was loading, and that if it needed propping over the trackway it was the rule and custom in the mine for the miner to prop it, for which he received extra pay,

and that the only distinction between the miner's duty as to the roof over the trackway and elsewhere in the rooms was, that he received extra pay for removing slate off the trackway, or timbering the roof over it. The plaintiff not only neglected to do as he was instructed by the mine-boss and promised to do, but went almost immediately after sending off a "shot" in the mine, which might have, as he admits, loosened the slate which fell on him, upon the trackway, and under the piece of slate, to see if it was loose. He says this was his duty, and it does not appear that it was the duty of the mine-boss to inspect the mine after every shot, which would have been a most unreasonable requirement. Why should he have gone so directly to see if this piece of slate was not loosened by the "shot" he sent off if he did not know that it was loose, and that he had neglected to prop it as he had promised, or that the "shot" or blast had probably loosened it, or when he knew, as he contends, that the mine-boss had not inspected the mine that day? The evidence does not show that the accident was due to the neglect of defendant company to inspect the mine, but that it occurred when the plaintiff was on his tour of inspection, which was a part of his duty after each shot sent off by him. It occurred under circumstances which he says would have made it "a pure accident." He assumed the risk, and must have known the danger, as he was not a stranger to such work. He was a miner of seven years' experience, familiar with the processes and forces used in operating the mine.

Knowing the unsafe condition of the place in which he was working, the plaintiff was not compelled to continue the work, and if he continued the work, without exercising ordinary prudence and care for his own safety, he must be held to have assumed not only the risks ordinarily incident to the service when he entered upon it, but such as became known to him in the progress of the work, or which were readily discernible by a person of his age and capacity, in the exercise of ordinary care. *Robinson* v. *Dinninny, supra.*

We are of opinion that the motion of the defendant company to set aside the verdict of the jury and award it a new trial should have been sustained. The judgment of the Circuit Court is therefore reversed and annulled, and the cause remanded for a new trial, to be had in accordance with this opinion.

*Reversed.*